**ROSSVILLE SALVAGE CORPORA-TION, Libellant-Appellee,**

v.

**READING COMPANY, Respondent-Appellant.**

**Nos. 232, 233, Dockets 26502, 26503.**

United States Court of Appeals Second Circuit.

Argued Feb. 7, 1961.

Decided March 21, 1961.

Martin J. McHugh, New York City (Macklin, Speer, Hanan & McKernan, New York City, on the brief), for respondent-appellant.

Farrell M. Kane, Staten Island, N. Y., for libellant-appellee.

Before LUMBARD, Chief Judge, MADDEN, Judge, United States Court of Claims,* and WATERMAN, Circuit Judge.

LUMBARD, Chief Judge.

On this appeal we are asked to reverse an interlocutory decree entered by the district court in an admiralty suit arising out of a collision on the Arthur Kill in the early morning hours of March 21, 1958. The appellant maintains the decree is partly based on a version of the facts which is contrary to the undisputed evidence submitted at the trial.

The only portion of the trial court's decision to which objection is made is the finding that the respondent-appellant's tug Tamaqua, which was proceeding along the Arthur Kill with a coal barge, Cape Walter, in tow, collided with the libellant-appellee's vessel, P. C. 1217, which was tied at anchor along the waterfront at Rossville, Staten Island. The respondent-appellant (hereinafter Reading) does not appeal from the finding that the Tamaqua collided with the ocean-going barge Bradley, which also belonged to the libellant (hereinafter Rossville) and was also moored along the waterfront. Nor does Reading challenge the trial court's dismissal of the libel and impleading petition filed by Reading against the U.S. Metals Refining Co., which was burning scrap wire on the shore when the collision occurred and which allegedly caused the damage by spreading smoke in the vicinity and obscuring visibility.

On this appeal Reading relies on the undisputed testimony regarding the location of the two Rossville vessels prior to the collision and to the damage suffered by each. The evidence established that the P. C. 1217 was moored some 700 feet to the north of the Bradley, and that it was 400 feet south of a red blinker buoy (Flashing Red Buoy No. 18) located at the point where the river changes course from a north-south to an east-west direction. The Tamaqua was proceeding southbound, towing the Cape Walter, and failed adequately to negotiate the turn at the buoy. Both the tug and the tow ran out of the channel and collided with some objects in Rossville's

* Sitting by designation.

yard which were not immediately identified.

On the day following the collision, Rossville's president found the P. C. 1217 in a sunken condition, and he testified that when the vessel was examined it was found to have a hole approximately 2 inches by 6 inches in its hull and that certain stanchions around the stern deck were bent outward. The Bradley was severely damaged, much of its stern planking was torn loose, and extensive repairs were necessary. The tug Tamaqua was apparently uninjured, but her tow, Cape Walter, suffered an indentation and hole in its port side bow. The P. C. 1217 and the Bradley were anchored 700 feet apart so that both could not have been damaged by a single blow resulting from one collision.

Reading here maintains that the testimony of the Tamaqua's captain establishes the fact that the Tamaqua itself did not collide with any other vessel, and that any damage must have been caused by the Cape Walter. Since the Cape Walter has a raked bow, so that the lower part recedes and is inboard of the upper part, Reading argues that it could not have struck a straight-sided vessel such as the P. C. 1217 and left only a small puncture at or below the water line without damaging the plates surrounding the hole, destroying the iron guard located on the side of the P. C. 1217, or causing other extensive damage to the side of the ship above the water line. Furthermore, Reading points to the outward direction in which the stanchions of the P. C. 1217 were bent and claims that had the Cape Walter collided with it, the stanchions would have been sheared off entirely or bent inward. Reading therefore concludes that the puncture in the P. C. 1217 was not caused by the collision and that the unidentified object into which the Cape Walter collided was a carfloat moored near the Bradley, and that this set off a chain reaction which propelled a small float into the stern of the Bradley.

These contentions presume, however, that the testimony of the Tamaqua's captain was believed by the trial judge and that it was found as fact that the Tamaqua did not itself collide with any other vessel. Rossville's night watchman testified that after hearing a crash he left his station and went to the dock to investigate. At that time he saw a tug about 25 feet away from the P. C. 1217, and it was "backing off of the boat." He also testified that he saw a "barge adrift." The trial judge apparently credited his testimony, since one of his findings of fact reads: "A few minutes after the collision, the tug 'Tamaqua' was seen backing away from the stern of the 'P. C. 1217.'" Since it is undisputed that the force of the collision parted the lines tying the Cape Walter to the Tamaqua, the trial judge found that it was at a point 400 feet beyond the buoy, where the P. C. 1217 was moored, and not where the Bradley lay, 1100 feet past the blinker, that a collision occurred which parted the tug and its tow. Thus, it is reasonable to conclude on the basis of these findings that what in fact happened is, as Rossville suggests here, that the Tamaqua first collided with the P. C. 1217, and a shackle welded onto its side punctured a hole in the hull of the P. C. 1217. This collision caused the lines tying the tug to the Cape Walter to part, and the tow then drifted some 700 feet southward and collided with the Bradley or with one of the floats nearby which then struck the Bradley.

We do not read the trial judge's Finding of Fact 12 as being in any way inconsistent with this version of the facts. That finding reads as follows:

"At approximately 400 feet beyond Flashing Red Buoy No. 18, and outside the channel of the Arthur Kill River, the tug 'Tamaqua' and her tow collided with the 'P. C. 1217' and the barge 'Bradley' with a sudden and heavy impact. At the time of the collision, the tug 'Tamaqua' and her tow were moving at a speed of approximately 10 miles per hour."

Although the finding refers only to one collision, it ascribes the damage to both

the Tamaqua and the Cape Walter, her tow. Under the version of the facts which we find most probable, each of these vessels collided separately with a vessel belonging to Rossville, and each did so with a sudden and heavy impact.

Although the trial judge did not specify in his findings exactly how it was that the vessels collided, or which struck which, we find that there is enough in the record to justify his finding that the P. C. 1217 was damaged as a result of a collision between it and Reading's tug or its tow. The findings of the trial judge are not clearly erroneous. McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20.

Affirmed.